UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WILLIAM ROGER DEKEYZER,

          Petitioner,

                                    CASE NO. 11-14622
v.                                 HONORABLE DENISE PAGE HOOD

SHIRLEE HARRY,

          Respondent.
_____/

**OPINION AND ORDER
DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, BUT
GRANTING IN PART A CERTIFICATE OF APPEALABILITY**

Petitioner William Roger Dekeyzer has applied for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is challenging his convictions for three counts of criminal sexual conduct on grounds that (1) a prosecution witness committed perjury at his trial, (2) his trial attorneys were ineffective, and (3) the admission of prior "bad acts" evidence deprived him of a fair trial and the right to remain silent. Respondent argues in an answer to the petition that none of Petitioner's claims have merit and that Petitioner procedurally defaulted one claim and failed to exhaust state remedies for another claim. The Court agrees with Respondent that Petitioner is not entitled to habeas corpus relief. The habeas petition therefore is

denied.  The reasons follow.

# I.  THE FACTS AND PROCEDURAL HISTORY

## A.  The Charges and Trial Testimony

Petitioner was charged in St. Clair County, Michigan with one count of criminal sexual conduct in the first degree, *see* Mich.  Comp. Laws § 750.520b(1)(a) (sexual penetration of a person under the age of thirteen), and two counts of criminal sexual conduct in the second degree, *see* Mich. Comp. Laws § 750.520c(1)(a) (sexual contact with a person under the age of thirteen).  The charges arose from allegations that Petitioner engaged in sexual activity with his underage granddaughter ("C.C.")[1] in 2004 and 2005 when she stayed with Petitioner and his wife on Harsens Island.  C.C. was nine or ten years old then and twelve years old in 2007 when she testified at Petitioner's jury trial in St. Clair County Circuit Court.  Her testimony and the testimony of the other witnesses is summarized below.

## Graham Rummel

Sergeant Graham Rummel of the Clay Township Police Department testified that, in February of 2006, a county agency known as Child Protective Services asked him to investigate Petitioner.  He subsequently spoke with Petitioner and Petitioner's daughter, Tracy Cook, and then forwarded a complaint to the prosecutor's office for

---

[1]  The Court will refer to the complainant by her initials.

2

review.

## Tracy Cook

Tracy Cook testified that she was Petitioner's daughter and C.C.'s mother.  In 2004, she and her husband started their own business and entrusted their minor children to her parents while she and her husband were working.  During the summer of 2004, C.C. complained that she was uncomfortable around Petitioner because he would hug her, rub her back, and then move his hands down toward her buttocks.  Ms. Cook thought that C.C. was merely feeling uncomfortable and self conscious about her maturing body.  She nevertheless spoke with Petitioner and asked him to stop hugging C.C. in the manner that he had been hugging her and to watch where he put his hands.  Petitioner did not say anything at the time, and Ms. Cook thought that the matter was resolved.

In the fall of 2004, C.C. became more apprehensive about staying with her grandparents, and she became exceptionally moody.  During the following summer, C.C. made excuses to avoid going to her grandparents' home because she was worried about Petitioner hugging and touching her.  Later that summer, Ms. Cook's sister, Cheryl Dekeyzer Johnson, informed Ms. Cook that C.C. had confided in her about inappropriate things Petitioner was doing to her.  Ms. Cook then talked to C.C. and learned more details about what was happening between Petitioner and C.C.  In

3

January of 2006, C.C. began having nightmares about Petitioner climbing in her window to hurt her. Ms. Cook then took C.C. to a counselor, who contacted the police.

On cross-examination, Ms. Cook testified that C.C. was not examined by a physician after she disclosed the sexual abuse. Ms. Cook claimed, however, that she did take C.C. to their family doctor, who advised Ms. Cook that, even if penetration occurred, it would not show up.

### Cheryl Dekeyzer Johnson

Petitioner's other daughter, Cheryl Dekeyzer Johnson, testified that she was forty-one years old and that she lived with her parents until she was eighteen years old. When she was six years old, Petitioner began having sexual contact with her. Initially, he would  hug and touch her through her clothes. As she got older, the sexual abuse progressed. Petitioner would fondle her, touch her breasts and genital area, put his finger in her vagina, try to insert his penis in her, and make her perform oral sex on him. Sometimes he performed oral sex on her or ejaculated on her. The abuse ended when she turned sixteen and confided in a nun at the school she attended. She never notified the police because she was not aware of that option and because she honestly thought that what Petitioner had done to her was how parents educated their children about sex. She confronted Petitioner about his conduct, but he had

4

responded, "When you walk around in a bikini, what am I supposed to do?"  She moved out of the house at age eighteen and later moved out of state.  She eventually moved back to Michigan and, in 2003, she began having contact with her sister Tracy Cook's children.  During the summer of 2005, C.C. told her what Petitioner had done to her.  Ms. Johnson then called C.C.'s mother, and C.C. informed her mother what had happened.

### The Complainant

C.C. testified that she was twelve years old and, when she was younger, she would  go to her grandparents' home on Harsens Island.  Beginning in 2004, Petitioner would hug her, rub her back, and touch her private area approximately once a week.  He also touched her buttock more than one time.  She was uncomfortable with Petitioner's behavior and informed her mother what was happening, but Petitioner continued to touch her private parts during the summer of 2005.  More than one time, Petitioner put his finger between the folds of the skin in her genital area, and he would rub her buttock with his hands.  She subsequently disclosed the abuse to her mother, her Aunt Cheryl, and the police.

The prosecutor rested after C.C. testified.  The defense witnesses included Michael D'Anniballe, Diane Dekeyzer, James Kristich, Ronald Dekeyzer, Stacy Carpenter, and Petitioner.

### Michael D'Anniballe

Mr. D'Anniballe testified that he dated Cheryl Dekeyzer Johnson from early 2003 to August of 2005. He did not consider Ms. Johnson or Tracy Cook to be truthful people, and, in his opinion, Ms. Johnson was the type of person who would manipulate other people. He had an opportunity to observe Ms. Johnson interact with Petitioner, and it did not appear to him that there was a strained relationship between the two of them. Ms. Johnson frequently called her parents, and they hugged one another when they greeted each other and when they said goodbye. C.C. appeared to be happy at the time, and she did not refuse her grandfather's embraces or touches. He never saw Petitioner rub C.C.'s buttocks, touch her breasts or vaginal area, or have any sexual contact with her, and he was very skeptical about Ms. Johnson's allegations that Petitioner sexually assaulted her multiple times a week between the ages of six and sixteen.

### Diane Dekeyzer

Petitioner's wife, Diane Dekeyzer, testified that she had a good relationship with Petitioner and believed he was an honest man. She claimed that she never noticed Petitioner acting improperly with his children and that there was nothing strange about Petitioner's interactions with C.C. during the summers of 2004 and 2005. She never saw Petitioner engage in sexual behavior with their daughter Cheryl

6

or touch C.C. in a sexual manner.  Mrs. Dekeyzer explained that, although her daughters initially were included in her and her husband's estate plans, their daughters were excluded from the estate plans in 2004 or 2005 after allegations were made about Petitioner.

### James Kristich

James Kristich testified that he lived next door to Petitioner on Harsens Island for ten years.  Although he could not recall seeing Petitioner interact with his children or grandchildren, he (Kristich) thought that he probably would have reported Petitioner to the police if he had seen Petitioner rub C.C.'s breasts.

### Ronald Dekeyzer

Ronald Dekeyzer was Petitioner's son and Cheryl Dekeyzer Johnson's brother. He testified that, when he lived in the family home, he never observed any sexual contact between Petitioner and Ms. Johnson, and he never saw any inappropriate behavior between Petitioner and C.C. during 2004 or 2005.  In the fall of 2005, he informed his sister Tracy that she and their sister Cheryl were not beneficiaries of their parents' trust.

### Stacy Carpenter

Stacy Carpenter was Ronald Dekeyzer's stepdaughter.  She testified that she had been to Petitioner and Diane Dekeyzer's home on Harsens Island many times and

that she never observed anything abnormal about Petitioner's behavior toward C.C. In her opinion, Tracy Cook was a liar and "very mean." Her mother, stepfather, step-grandfather, and a few other people on the island also thought that Ms. Cook was a liar.

### William Roger Dekeyzer

Petitioner testified that he was a sixty-three-year-old retiree from General Dynamics and the father of four children. He claimed that he did not currently have a relationship with his daughter Cheryl due to the allegations that she had made against him. He denied raping Cheryl or touching her inappropriately during Cheryl's childhood.

Petitioner also denied inappropriately touching his granddaughter during the summers of 2004 and 2005. He specifically denied touching C.C.'s breasts and buttocks or putting his finger in C.C.'s vagina. He denied all the serious allegations that had been made about him at trial, and he claimed to be telling the truth.

As for his estate plans, Petitioner explained that his trust was valued at more than two million dollars and that his wife, two sons, and grandchildren, including C.C., were the beneficiaries of the trust. He and his wife initially planned to leave their wealth to their four children, but in 2005, he decided not to leave any money to his daughters because of the unfounded allegations they were making about him. The

8

trust was finalized in May of 2006.

**B. The Verdict, Sentence, Motion for New Trial, and Appeal**

On August 10, 2007, the jury found Petitioner guilty, as charged, of one count of criminal sexual conduct in the first degree and two counts of criminal sexual conduct in the second degree. On September 10, 2007, the trial court sentenced Petitioner to imprisonment for eighty-one months (six years, nine months) to thirty years for the first-degree criminal-sexual-conduct conviction and to a concurrent term of nineteen months (one year, seven months) to fifteen years for the two second-degree criminal-sexual- conduct convictions.

Petitioner moved for a new trial, claiming that he had new evidence that Tracy Cook committed perjury at his trial. The alleged perjury was Tracy Cook's testimony that she consulted Dr. James Faremouth, Jr., after C.C. disclosed the sexual abuse. In support of his motion, Petitioner attached an affidavit from Dr. Faremouth, who averred that he never discussed any sexual abuse of C.C. with C.C.'s mother. The trial court held oral arguments on Petitioner's motion and then denied the motion. According to the trial court, new evidence that Dr. Faremouth did not examine the victim would not have produced a different result in the case.

Petitioner appealed his convictions to the Michigan Court of Appeals. He argued that: (1) the trial court admitted prior "bad acts" evidence in violation of

9

Michigan Rule of Evidence 404(b) and his right to due process of law; (2) the admission of prior "bad acts" evidence violated Michigan Rule of Evidence 403 and his constitutional rights to due process and to remain silent; (3) trial counsel was ineffective for failing to (a) propose a limiting jury instruction on the improper "bad acts," (b) object or investigate Tracy Cook's perjury, and (c) attempt to obtain Cheryl Dekeyzer Johnson's mental health records; and (4) the trial court erred by refusing to hold an evidentiary hearing on his motion for new trial.  The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished, *per curiam* opinion, *see People v. Dekeyzer*, No. 281207 (Mich. Ct. App. Aug. 13, 2009), and on April 27, 2010, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Dekeyzer*, 486 Mich. 900; 780 N.W.2d 805 (2010) (table).  On July 26, 2010, the state supreme court denied reconsideration. *See People v. DeKeyzer*, 487 Mich. 859; 784 N.W.2d 210 (2010) (table).

### C.  The Habeas Petition and Responsive Pleading

Petitioner filed his habeas corpus petition through counsel on October 20, 2011. He argues that:  (1) his convictions were obtained through the use of perjured testimony; (2) his trial attorneys rendered ineffective assistance by failing to (a) propose a limiting jury instruction on the "bad acts" evidence, (b) object or investigate the proffered perjury, and (c) obtain Cheryl Dekeyzer Johnson's mental health records

10

for *in camera* review; and (3) he was denied his right to a fair trial and his right to remain silent by the admission of prior "bad acts" evidence.

Respondent asserts that Petitioner did not exhaust state remedies for his claim about the prosecutor's use of perjured testimony because he styled the issue on direct appeal as an error by the trial court in denying his request for an evidentiary hearing or new trial on his perjury claim. Respondent contends that the first subsection of Petitioner's second claim (trial counsel's failure to request a jury instruction on "bad acts" evidence) is procedurally defaulted because the Michigan Court of Appeals deemed the claim waived. Finally, Respondent argues that Petitioner's "bad acts" claim is not cognizable on habeas review and that the state court's decision was not contrary to clearly established Supreme Court precedent.

The doctrines of procedural default and exhaustion of state remedies are not jurisdictional matters. *See Trest  v. Cain,* 522 U.S. 87, 89 (1997) (stating that "a procedural default . . . is not a jurisdictional matter"); *Castille v. Peoples*, 489 U.S. 346, 349 (1989) (noting that the exhaustion rule is not a jurisdictional requirement). And federal courts are not required to address the two doctrines before deciding against the petitioner on the merits. *See* 28 U.S.C. § 2254(b)(2) (stating that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

11

States"); *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (noting that "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits"). The alleged procedural errors in this case are excused because Petitioner's claims do not warrant habeas relief, and the Court finds it is more efficient to proceed directly to the merits of Petitioner's claims than to analyze whether the claims are unexhausted or procedurally defaulted.

## II. STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

12

Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

AEDPA "imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.' " *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).

 "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v.*

13

*Andrade*, 538 U.S. 63, 75 (2003)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 786-87. Habeas review, moreover, is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1398 (2011).

## III.  ANALYSIS

### A.  Perjury

At a pretrial hearing, the prosecutor asserted that C.C. did not have a medical examination and that the prosecution was not withholding any medical records from defense counsel.  (Mot. Hr'g, 11, 13, Aug. 6, 2007.)  C.C.'s mother, Tracy Cook, subsequently testified at trial that, although C.C. was not examined for any injuries after she disclosed what Petitioner had done to her, Ms. Cook did take C.C. to a family doctor named Faremouth and that Dr. Faremouth had said any penetration of C.C. would not be visible, even if it had occurred.  (Trial Tr. Vol. II, 482-83, Aug. 8, 2007.)

Petitioner asserts that Ms. Cook's testimony on this point constituted perjury because Dr. Faremouth has averred in an affidavit, which he signed after Petitioner's trial, that he did not discuss any allegations of sexual abuse with Ms. Cook.

14

According to Petitioner, the perjury undermined his defense that, if Tracy Cook truly believed her daughter had been sexually abused, she would have had C.C. examined. The Michigan Court of Appeals determined on review of Petitioner's claim that a new trial on the newly discovered evidence was unwarranted because informing the jury that the victim's mother had committed perjury would not make a different result more probable on retrial.

### 1.  Clearly Established Federal Law

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs,* 427 U.S. 97, 103-104 (1976).  Prosecutors, as representatives of the state, may not deceive a court and jurors by eliciting false evidence or by allowing false testimony to go uncorrected when it appears.  *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  The United States Court of Appeals for the Sixth Circuit has

> fashioned a three-part test for determining whether there was a denial of due process through the use of false testimony:

>> In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the

15

> defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.
>
> *Brooks* [*v. Tennessee*, 626 F.3d 878, 894-95 (6th Cir. 2010)] (quoting *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998)). Testimony is material only if there is a reasonable likelihood that it affected the judgment of the jury. *Id.* at 895.

*Peoples v. Lafler*, __ F.3d __, __, No. 11-2161, 2013 WL 5811601, at *10 (6th Cir. Oct. 30, 2013).

### 2. Application

Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Whether Tracy Cook actually committed perjury when she testified that she consulted Dr. Faremouth about C.C.'s allegations of sexual abuse is questionable. She could have been telling the truth about consulting Dr. Faremouth, and Dr. Faremouth could have been mistaken when he averred in his affidavit that he did not speak with Ms. Cook about allegations of sexual abuse perpetrated on C.C. Even if Ms. Cook was mistaken about consulting Dr. Faremouth, inaccurate testimony is not necessarily perjury. It can be the result of confusion, mistake, or faulty memory. *Dunnigan*, 507 U.S. at 94.

Not only is there no definitive proof that Tracy Cook perjured herself, there is

16

no indication in the record that the prosecutor knew Tracy's trial testimony was false. The prosecutor maintained before trial that there was no physical examination of C.C. She did not say that anything about whether Tracy Cook consulted a physician regarding C.C.'s allegations, and Dr. Faremouth's contradictory affidavit did not come to light until after the trial.

The alleged perjury also was not material evidence. Whether Ms. Cook consulted a physician was not significant. The broader issue was the lack of physical evidence supporting the charges, and Ms. Cook admitted that Dr. Faremouth did not examine C.C. for signs of injury or sexual abuse. This testimony supported defense counsel's argument that reasonable doubt existed because there was no medical or physical evidence to corroborate C.C.'s allegations and because no one bothered to have C.C. examined to determine whether she had been injured by the alleged abuse.

There is not a reasonable likelihood that Tracy Cook's allegedly false testimony affected the jury's verdict in light of the other evidence in the case, including C.C.'s testimony and Cheryl Dekeyzer Johnson's testimony, which tended to make Petitioner's denial of the charges appear incredible. Even if the jury concluded that Ms. Cook lied about consulting a physician, the jury was free to accept other aspects of her testimony.     Furthermore, the defense theory was not

17

completely undermined by evidence that Ms. Cook had consulted a physician about C.C.'s allegations of sexual abuse. Defense counsel emphasized that reasonable doubt existed because: (1) nobody testified that they observed the alleged abuse, despite allegations that the abuse occurred multiple times over a period years while other people were nearby; (2) C.C. was a pawn of Tracy Cook and Cheryl Dekeyzer Johnson, who were motivated by greed and were retaliating against their father for being eliminated as beneficiaries of their parents' future estate; and (3) the three main prosecution witnesses were not credible, for Tracy Cook and Cheryl Dekeyzer Johnson were known to be liars, and C.C. could not remember details about the alleged abuse.

The Court concludes that Petitioner has failed to satisfy the three-part test for perjury. Even if he were able to show that Ms. Cook's statement about consulting Dr. Faremouth was actually false, he has not shown that the statement was material, or that the prosecution knew the statement was false. And the state appellate court's rejection of Petitioner's claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. at 786-87. The Court therefore denies relief on Petitioner's perjury claim.

### B. Trial Counsel

18

Next, Petitioner alleges that his trial attorneys rendered constitutionally ineffective assistance.  He blames his attorneys for failing to (1) propose a limiting jury instruction on the "bad acts" evidence, (2) object to, or investigate, the proffered perjury, and (3) obtain Cheryl Dekeyzer Johnson's mental health records for *in camera* review.  The Michigan Court of Appeals rejected each of these claims and concluded that Petitioner was not deprived of effective assistance of counsel.

### 1.  Clearly Established Federal Law

To prevail on his claim, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An attorney's performance is considered deficient if it was "outside the wide range of professionally competent assistance." *Id.* at 690.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.  And, because of the difficulties inherent in assessing counsel's performance and evaluating counsel's conduct from his or her perspective at the time, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might

19

be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To satisfy the prejudice prong of the *Strickland* test, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).

Habeas relief may be granted only if the state-court decision unreasonably applied the *Strickland* standard. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). The question is not whether the Court "'believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" *Id.* at 123 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

### 2. Failure to Propose a Limiting Jury Instruction

Petitioner contends that his trial attorneys were ineffective for failing to propose a limiting jury instruction on Cheryl Dekeyzer Johnson's "bad acts" testimony. The Michigan Court of Appeals determined that Petitioner waived appellate review of this

20

claim by approving of the instructions as read to the jury.  The Court of Appeals also presumed that trial counsel's decision to approve the jury instructions, as read to the jury, was sound trial strategy, because an additional instruction could have unduly highlighted Ms. Johnson's testimony.  Petitioner replies that his trial attorneys were ineffective precisely because they failed to object to the jury instructions as read to the jury.

This is not a case where the trial court failed to read a jury instruction on evidence of other uncharged acts.  The trial court gave the following instruction:

> You've heard evidence that was introduced to show that the Defendant has engaged in improper sexual conduct for which the Defendant is not on trial.
>
> If you believe this evidence, you must be very careful to consider it for only one limited purpose, that is, to help you judge the believability of testimony regarding the acts for which the Defendant is now on trial.
>
> . . . .
>
> You must not consider this evidence for any other purpose.  For example, you must not decide that it shows that the Defendant is a bad person or that the Defendant is likely to commit crimes.  You must not convict the Defendant here because you think he's guilty of other bad conduct.

(Trial Tr. Vol. IV, 878-79, Aug. 10, 2007.)

Petitioner maintains that this instruction did not apply to Cheryl Dekeyzer Johnson's testimony and that it applied only to C.C.'s testimony about other

21

uncharged acts.  The Court disagrees.  The instruction pertained to any testimony, not merely the complainant's testimony, about uncharged sexual misconduct committed by Petitioner.  The Court therefore agrees with the Michigan Court of Appeals that the trial court's instruction "sufficiently conveyed to the jury not to improperly use [Ms.] Johnson's testimony." *Dekeyzer*, Mich. Ct. App. No. 281207, at 3.  Trial counsel was not ineffective for failing to propose an additional jury instruction on how to evaluate "bad acts" evidence.

### 3.  Failure to Object or Investigate the Alleged Perjury

Petitioner alleges next that his trial attorneys were ineffective for failing to object to Tracy Cook's perjury.  As noted above, it is not entirely clear whether Tracy Cook committed perjury when she testified that she consulted Dr. Faremouth after C.C. made her allegations of sexual abuse.  It was even less clear at the time of Petitioner's trial, which predated Dr. Faremouth's affidavit stating that he never discussed allegations of sexual abuse with Tracy Cook.

Petitioner nevertheless contends that his attorneys should have moved for a continuance to locate Dr. Faremouth.  His trial attorneys, however, have stated in a post-trial affidavit that Tracy Cook's comment about consulting Dr. Faremouth was a complete surprise to them and, because the comments occurred during trial, they could not investigate the allegation, nor obtain any records from Dr. Faremouth.  To

22

their credit, trial counsel attempted to discredit Ms. Cook's testimony by eliciting testimony from other witnesses that she was a liar and by trying to show that her allegations about Petitioner stemmed from being excluded from her parents' estate plans.

Petitioner also contends that his attorneys should have  cross-examined Ms. Cook about her previous representations that there was no medical consultation.  But the previous representations were that there was no medical examination and there were no medical records.   Ms. Cook's testimony was consistent with these representations.  She testified that, although she consulted Dr. Faremouth, the doctor did not physically examine C.C.

Even if trial counsel's performance was deficient, the deficient performance did not prejudice the defense because the defense theory was multifaceted and, as explained above, there is not a reasonable likelihood that the allegedly false testimony affected the jury's verdict.  The Court therefore concludes that Petitioner's trial attorneys were not ineffective for failing to do more when Ms. Cook testified that she consulted Dr. Faremouth and that Dr. Faremouth had said there would be no evidence of penetration if it had occurred.

### 4.  Failure to Obtain a Witness's Psychiatric Records

Petitioner's final claim about his trial attorneys is that they failed to obtain

23

Cheryl Dekeyzer Johnson's psychiatric records for *in camera* review.[2]  Petitioner claims that Ms. Johnson's mental health records were the only contemporaneous records that he could use to impeach her.

Petitioner merely speculates that Ms. Johnson's records would have contained impeachment material.  His claim lacks merit for an additional reason:  his attorneys *did* attempt to acquire Ms. Johnson's medical and psychiatric records, and the reason that they failed to obtain the records is that the trial court denied the defense motion for release of the records.

Petitioner contends that the trial court ruled on C.C.'s medical records, but never ruled on the issue of Ms. Johnson's records.  The Court disagrees.  The defense motion sought a waiver of privileges and release of medical and psychiatric records for C.C. *and* Ms. Johnson, and the trial court denied the motion without limiting its ruling.  *See* Motion to Compel Waiver of Physician-Patient, Sexual Assault Counselor-Client, Social Worker-Patient, Psychiatrist-Psychologist-Patient and Therapist-Patient Privileges, Docket No. 8-12; *see also* Mot. Hr'g, 23-29, Feb. 20, 2007; Mot. Hr'g, 5-27, Aug. 6, 2007.  The fact that the attorneys were unable to obtain Ms. Johnson's records due to an unfavorable court ruling is not a basis for habeas

---

[2]

Ms. Johnson testified in a pretrial hearing that she began seeing doctors and therapists when she was sixteen years old and that, in 1984 and 1987, she was hospitalized for depression.

relief. *Youngblood v. Maggio*, 696 F.2d 407, 410 (5th Cir.1983). The attorneys were unsuccessful, but not ineffective.

For all the foregoing reasons, the Court finds that Petitioner's trial attorneys were not constitutionally ineffective. As such, the state appellate court's rejection of Petitioner's ineffectiveness claims was objectively reasonable.

### C. "Other Acts" Evidence

Petitioner's third and final claim challenges the admission of prior "bad acts" evidence at his trial. The evidence consisted of Cheryl Dekeyzer Johnson's testimony that Petitioner sexually abused her for a period of ten years, beginning when she was six years old and ending when she was sixteen years old. Petitioner asserts that Ms. Johnson's testimony violated his right to due process because it was virtually impossible for him to impeach Ms. Johnson's testimony about events that occurred thirty-five years earlier. Petitioner also contends that Ms. Johnson's testimony violated his constitutional right to remain silent because he was required to testify to address her allegations.

The Michigan Court of Appeals concluded on the basis of state law that the trial court did not abuse its discretion by admitting the evidence. The Court of Appeals opined that the evidence was admitted for a proper purpose, that the evidence was relevant, and that any prejudice caused by the admission of the evidence did not

25

substantially outweigh the probative value of the evidence.

Petitioner has not cited any case law, much less a Supreme Court decision, to support his contention that the admission of "bad acts" evidence violated his Fifth Amendment right to remain silent. The Court therefore rejects his Fifth Amendment claim.

Petitioner's additional allegations – that Ms. Johnson's testimony violated the protections afforded by Michigan Rule of Evidence 403 and that the trial court failed to determine whether the requirements of Michigan Rule of Evidence 404(b) were met – are not cognizable here because "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

As for Petitioner's due process claim,

> [t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence . . . . While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed.2d 574 (1997); *Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), it has not explicitly addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003). Because there is no Supreme

26

Court precedent barring the use of "bad acts" evidence on constitutional grounds, Petitioner is not entitled to relief on his evidentiary claim. His disagreement with the state court's ruling on "bad acts" evidence involves no constitutional dimension and, therefore, is not a cognizable claim on federal habeas corpus review. *Bey v. Bagley*, 500 F.3d 514, 523 (6th Cir. 2007).

Although an evidentiary ruling can violate due process and thus warrant habeas corpus relief if the ruling was "so egregious that it result[ed] in a denial of fundamental fairness," *Bugh v. Mitchell*, 329 F.3d at 512, the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). And, for the following reasons, the use of "bad acts" evidence in this case was not fundamentally unfair.

In Michigan, evidence that a defendant in a criminal case committed another sex offense against a minor is admissible "and may be considered for its bearing on any matter to which it is relevant." Mich. Comp. Laws § 768.27a(1). Ms. Johnson's testimony was relevant to show Petitioner's scheme, plan, or system of engaging in sexual acts with minor female relatives. As explained in more detail by the Michigan Court of Appeals,

> [t]he proper purpose of admitting the 404(b) evidence was to show defendant's plan or scheme to exploit young girls who were closely

27

related to him by using his position of trust in the family to take advantage of them. The victim's aunt testified that defendant, her father, touched her breasts and genitals, engaged in oral sex with her, and attempted to engage in penile penetration. Similarly, the victim testified that her grandfather would give her "hugs and he would rub [her] back" and that he "would touch" her "private areas." The victim also circled the genital area of a drawing during direct examination to indicate where defendant had touched her. She also explained that her grandfather put his finger in between the folds of skin on her vagina and that he "moved [his finger] around." The manner in which defendant would hug and put his arm around the two victims and then proceed to touch their genitals demonstrates a common plan or scheme. The testimony by the victim's aunt that her father molested her was relevant as it tended to illustrate that defendant's actions were a part of a common plan or scheme. *See People v. Kahley*, 277 Mich. App. 182, 185, 744 N.W.2d 194 (2007) ("Evidence of uncharged acts may be admissible to show that the charged act occurred if the uncharged acts and the charged act are sufficiently similar to support an inference that they are manifestations of a common plan or scheme.").

*Dekeyzer*, Mich. Ct. App. No. 281207, at 2.

Trial counsel, moreover, had an opportunity to elicit testimony that Cheryl Dekeyzer Johnson was manipulative and dishonest and that her allegations were retaliation for being eliminated as a beneficiary of her parents' trust. Trial counsel also pointed out to the jury that Petitioner was not on trial for the allegations made by Ms. Johnson, and the trial court instructed the jury on the proper use of "bad acts" evidence. The Court therefore concludes that Petitioner was not deprived of a fair trial or due process of law by the admission of "bad acts" evidence. Although the evidence was prejudicial, it was not fundamentally unfair.

28

## IV.  CONCLUSION

The state appellate court's rejection of Petitioner's claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable application of the facts.  Habeas relief, therefore, is not warranted. The Court **DENIES** the petition for a writ of habeas corpus (Docket No. 1, filed October 20,  2011).

## V.  DENIAL OF A CERTIFICATE OF APPEALABILITY

Before a habeas petitioner may appeal the denial or dismissal of a habeas petition, a certificate of appealability must issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).        Reasonable jurists could disagree with the Court's assessment of Petitioner's perjury claim and the related claim about trial counsel's failure to object to the alleged perjury.  The Court therefore grants a certificate of appealability on those two claims.  The Court declines to issue a

29

certificate of appealability on the remaining claims, because reasonable jurists could not conclude that those issues are adequate to deserve encouragement to proceed further.

**IT IS SO ORDERED**.


S/Denise Page Hood
United States District Judge


Dated:  December 4, 2013


I hereby certify that a copy of the foregoing document was served upon counsel of record on December 4, 2013, by electronic and/or ordinary mail.


S/LaShawn R. Saulsberry
Case Manager

30